**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────

**STOKELY-VAN CAMP, INC.,**

       **Plaintiff and Counterclaim-**
       **Defendant,**                                  **09 Civ. 3741 (JGK)**

       **- against -**                                   <u>**OPINION AND ORDER**</u>

**THE COCA-COLA COMPANY, ET AL.,**

       **Defendants and Counterclaim-**
       **Plaintiffs.**
────────────────────────────

**JOHN G. KOELTL, District Judge:**

This is a case about an advertising battle between two major consumer products companies over one company's comparison of its beverage to human sweat. That company advertises its beverage by promoting its inclusion of certain electrolytes contained in sweat, and its competitor wants it to stop.

In late March 2009, the defendants The Coca-Cola Company and Energy Brands Inc. (collectively, "Coca-Cola") launched a reformulation of its Powerade sports drink beverage called "Powerade ION4." Powerade ION4's main point of differentiation is that it is allegedly more like human sweat than both old Powerade and plaintiff Stokely-Van Camp's ("SVC") flagship product, Gatorade Thirst Quencher, in particular because Powerade ION4 includes small quantities of calcium and magnesium, small amounts of which are lost in sweat. On April 13, 2009, SVC filed this action against Coca-Cola for false

advertising, trademark dilution, deceptive acts and practices, injury to business reputation, and unfair competition under the Federal Trademark Act of 1946, as amended, 15 U.S.C. § 1051, et seq. (the "Lanham Act"), as well as New York state law.  SVC also filed this motion to enjoin Coca-Cola from continuing to make allegedly false and misleading claims in its advertising for its Powerade ION4 product.  SVC protests various advertising claims about Powerade ION4 and its inclusion of calcium and magnesium.  It also complains about Coca-Cola's referring to Powerade ION4 as "The Complete Sports Drink," although it concedes it would be perfectly fine for Coca-Cola to refer to Powerade ION4 as "A Complete Sports Drink."

At a two-day preliminary injunction hearing held on June 4 and 5, 2009, the parties presented evidence and argument in support of and in opposition to the motion.  Having reviewed the evidence, assessed the credibility of the witnesses, and considered the arguments of counsel, the Court makes the following Findings of Fact and reaches the following Conclusions of Law pursuant to Fed. R. Civ. P. 52(a) and 65.

## FINDINGS OF FACT

### *Parties*

1.   Plaintiff Stokely-Van Camp, Inc. ("SVC") is a corporation organized under the laws of the State of Indiana

with its principal place of business in Illinois.  SVC markets
Gatorade Thirst Quencher and other Gatorade-branded products
(collectively "Gatorade").  SVC is a wholly-owned subsidiary of
PepsiCo, Inc.  (See Urban Tr. 26-27; Compl. ¶ 7.)

2.   Defendant The Coca-Cola Company is a corporation
organized under the laws of the State of Delaware with its
principal place of business in Atlanta, Georgia.  Defendant
Energy Brands Inc. is a corporation organized under the laws of
the State of New York with its principal place of business in
New York.  Energy Brands Inc. is a wholly-owned subsidiary of
The Coca-Cola Company and does business under the name Glacéau.
The Coca-Cola Company and Energy Brands Inc. (collectively
"Coca-Cola") market Powerade ION4.  (See Madden Tr. 221; Bracken
Tr. 259; Compl. ¶ 9-10.)

### Background

3.   SVC's Gatorade and Coca-Cola's Powerade are the
primary two players in the United States sports drink market.  A
sports drink is a beverage containing carbohydrates and
electrolytes that serves the principal purpose of hydrating
athletes and physically active consumers.  Sports drinks are
designed to help athletes replace fluids in the body lost
through sweat and aid them in sustaining athletic performance.
(Horswill Tr. 96-97.)  According to the sports medicine
community, a sports drink has several components.  (Horswill Tr.

98-99.)  First, a sports drink includes electrolytes, which are also sometimes referred to as "salts." (Horswill Tr. 96.)  The most important electrolyte is sodium which stimulates rapid absorption of liquid by the body, helps the body retain fluid, and also stimulates the thirst response to encourage drinking. (Horswill Tr. 97-98.)  Sports drinks often contain potassium as well, which also aids in hydration.  (Horswill Tr. 99-101.) Second, to provide energy to consumers, a sports drink should contain carbohydrates, usually in the form of glucose. (Horswill Tr. 96-98.)  In addition to providing carbohydrate energy, glucose also facilitates the speedy absorption of liquid in the body and has the added benefit of making sports drinks taste more palatable than sweat.  (Horswill Tr. 97-98.)

4.   SVC's Gatorade Thirst Quencher, created in 1965, dominates the United States market for sports drinks and is the number one selling sports drink in the world.  (Urban Decl. ¶¶ 4-5.)  Gatorade sales exceed $4 billion each year, and Gatorade products comprise between 75 and 80 percent of the United States sports drink market.  (Urban Tr. 27, 41.)

5.   Powerade was introduced by Coca-Cola more than 15 years ago and now accounts for around 20 percent of the United States sports drink market.  Powerade was originally marketed as a less expensive alternative to Gatorade and has been perceived

by many as a "me too" version of Gatorade.  (Bracken Tr. 260;
Bracken Decl. ¶ 3; Madden Tr. 224.)

### Development of Powerade ION4

6.    In 2007, Coca-Cola acquired Energy Brands Inc., which
does business as Glacéau, and shortly thereafter moved marketing
and sales responsibility for Powerade to Glacéau.  (Bracken Tr.
259.)  In 2008, Glacéau embarked on a project to rejuvenate the
Powerade brand in order to improve Powerade's market position.
(Bracken Tr. 259-60; Madden Tr. 224.)

7.    Glacéau considered a number of ways to improve
Powerade, ultimately deciding to position it as a "true sweat
replacement" product.  (Madden Tr. 225-26; Bracken Tr. 260.)
Dr. Eileen Madden, Glacéau's Director of Scientific, Regulatory,
and Consumer Affairs, testified that Glacéau in fact borrowed
this idea from SVC, which had successfully marketed Gatorade as
a "sweat replacer" for years.  (Madden Tr. 225-26.)  Dr. Madden
further explained:

> [W]e thought that if we could take the composition of sweat
> and mimic it more closely with respect to the ions that you
> lose, particularly the positive ions that you lose, that
> would be beneficial insofar as we would have something that
> would be easy for consumers to understand but also would be
> a reasonable replacement for what you lose in sweat.

(Madden Tr. 225-26.)  In other words, Glacéau believed it could
gain a competitive edge in the sports drink market by coming up
with a product that surpassed Gatorade in being more like sweat.

8.    In researching strategies for how to position Powerade as a sweat replacer, Dr. Madden learned of a 2007 Position Stand by the American College of Sports Medicine on Exercise and Fluid Replacement (the "article" or "Position Stand").  (Madden Tr. 226-27.)  That article summarized the current state of knowledge about sweat composition and sweat loss, and reported the averages in which four electrolytes—sodium, potassium, calcium, and magnesium—are lost in sweat.  (PX 13.)  The article was co-authored by Dr. Nina Stachenfeld ("Dr. Stachenfeld"), an expert witness who testified on behalf of SVC at the preliminary injunction hearing.  Dr. Stachenfeld testified that the article is "recognized as an authoritative statement" on "the current state of the scientific knowledge on the topic of exercise and fluid replacement."  (Stachenfeld Tr. 196.)

9.    Relying on the Position Stand, Dr. Madden began to consider ways to reformulate Powerade.  The then-current Powerade formulation was perceived by some as containing an insufficient amount of sodium.  Dr. Madden believed that increasing the amount of sodium and adding calcium and magnesium in the new formulation of Powerade would address some of the perceived shortcomings of the existing Powerade and provide a benefit that could be conveyed to consumers, namely, that Powerade helps replenish the four key electrolytes lost in sweat.  (Madden Tr. 225-26.)  As Dr. Madden explained, "the

calcium and the magnesium are important nutrients, and to the
extent that they are lost in sweat, it's incremental, so we
thought replacing them would be . . . an advantage to the
product." (Madden Tr. 256.)

10. Using the averages of the four specific electrolytes
lost in sweat as reported in the Position Stand, Dr. Madden
calculated a ratio of those averages: 100 parts sodium to 24
parts potassium to 3 parts calcium to 1 part magnesium. (Madden
Tr. 227-28; DX 11.) Glacéau then developed a sports drink
formulation that maintained this ratio. Dr. Madden explained
that it was not feasible to formulate the beverage to match
"exactly the composition of sweat" because the amount of sodium
– roughly 800 mg per eight-ounce serving – "would be incredibly
salty and kind of unpalatable." (Madden Tr. 228.) Glacéau
therefore chose to include 100 mg of sodium, an amount
comparable to Gatorade Thirst Quencher, and to add the three
other electrolytes, namely potassium, calcium, and magnesium, in
the ratio of the averages reported in the Position Stand.
(Madden Tr. 228-29.)

11. With the help of an outside advertising agency,
Glacéau came up with the name "Powerade ION4 – Advanced
Electrolyte System" for the new formulation. The agency
proposed a number of advertising messages to Glacéau, which were

forwarded to Glacéau's scientists, including Dr. Madden, for
input.

12.   Dr. Madden stated that she thought the Powerade ION4
brand name was "a great idea" and that they "would be able to
defend that it is a unique package since there is no other
product using the four electrolytes in the same ratio and
level." (DX 157.)  She viewed the proposed claim that Powerade
ION4 "replenishes four critical electrolytes in the same ratio
typically lost in sweat" as scientifically accurate and fully
substantiated.  (Madden Tr. 236.)  She also did not object to
the proposed description of Powerade ION4 as "the complete
sports drink" and testified that she considered the message to
be "puffery."  (Madden Tr. 235.)

13.   However, Dr. Madden expressed reservations about the
proposed characterization of Gatorade as "incomplete."  (Madden
Tr. 232.)  Dr. Madden's explained that she was concerned about
the term "incomplete" because there is no standard for what
constitutes a "complete" sports drink, and she worried that the
term "incomplete" might imply to consumers that Gatorade was not
a functional sports drink.  (Madden Tr. 232-34.)

14.   Frank Bracken ("Mr. Bracken"), Glacéau's Brand
Director for Powerade, testified that the Powerade marketing
group did not intend the term "incomplete," as used in the
Powerade ION4 ads, to "identify some scientific standard by

which [a] sports drink either is or is not incomplete."
(Bracken Decl. ¶ 2; Bracken Tr. 276.)  Rather, Mr. Bracken
testified that "incomplete" was meant to convey "[n]othing more
than Gatorade Thirst Quencher did not have calcium or magnesium
in its formula."  (Bracken Tr. 276.)

### SVC's Prior History of Touting Calcium and Magnesium

15.  As with the concept of touting a sports drink as a
"sweat replacer," Coca-Cola's idea of adding calcium and
magnesium to a sports drink was not new.  In 2004, Gatorade
introduced a product called Gatorade Endurance Formula, targeted
at elite athletes.  (Urban Tr. 53-54; Horswill Tr. 153-54.)  In
addition to containing more sodium than Gatorade Thirst
Quencher, Gatorade Endurance Formula includes potassium and
small amounts of calcium and magnesium.  (Urban Tr. 70; Horswill
Tr. 110-13.)

16.  Until recently, SVC touted the inclusion of calcium
and magnesium in Gatorade Endurance Formula.  In fact, SVC
appears to have gone further than even Coca-Cola, directly
attributing performance and hydration benefits to the presence
of these two electrolytes in Gatorade Endurance Formula.

17.  SVC's focus on calcium and magnesium began in the mid-
1990s, when researchers at SVC's Gatorade Sports Science
Institute (or "GSSI") began to explore ways to improve the
formula for Gatorade Thirst Quencher.  (Horswill Tr. 127.)  SVC

initially planned to increase the amount of sodium in the
product.  (Urban Tr. 100-01.)  But as the research – known
internally as "Project Margarita" – progressed, SVC began to
consider other formula changes as well, due to SVC's concern
that it would be difficult to interest consumers in a new sports
drink whose sole point of distinction was a substantially
greater salt content.  (Urban Tr. 85-87.)

18.  As a result, SVC began experimenting with the
introduction of calcium and magnesium into a sports drink
formulation.  At that point, these electrolytes had never before
been included in a sports drink, even though they are present in
sweat.  (Horswill Tr. 129-30; DX 64.)

19.  SVC recognized, at a minimum, that calcium and
magnesium would help "replace what [i]s lost in sweat."  (Urban
Tr. 75; Horswill Tr. 115.)  As the company's scientists
explained in contemporaneous documents, they further believed
that by adding these two "intracellular ions," which they viewed
as "critical to cellular hydration," they could enhance the
efficacy of Gatorade, based on research that "indicate[d] that
magnesium may also play a role in promoting fluid retention . .
. ."  (DX 64; Horswill Tr. 132-35.)

20.  The "research" to which the SVC scientists referred
were several studies conducted at Yale University, as well as a
series of studies conducted internally at GSSI.  Some of these

10

studies indicated that the addition of magnesium or a
combination of calcium and magnesium to a formulation including
sodium and potassium promoted more complete hydration as
compared to a formulation including sodium and potassium alone.
(PX 10 at SVC 1003, SVC 1028; Horswill Tr. 104-05.)  Other
follow-up studies, however, showed no statistically significant
effect of magnesium on hydration.  (Horswill Tr. 105-09.)
Although these studies did not conclusively show that calcium or
magnesium had any positive effect on hydration, SVC scientists
considered the findings "promising."  (Horswill Tr. 146.)  And
although the follow-up tests did not yield statistically
significant results, SVC noted that the "[e]xpanded electrolyte
blend shows positive effects and warrants further
investigation."  (PX 10 at SVC 1028.)

     21.  Based on the results of these studies, SVC sought to
formulate a product that included calcium and magnesium, which
its scientists described as "key electrolytes lost in sweat."
(DX 82; Horswill Tr. 156-57.)  In 2002 these scientists,
including Dr. Craig Horswill ("Dr. Horswill"), who now heads the
GSSI, prepared a detailed memorandum entitled "Proposal and
Rationale for Electrolytes in Gatorade Products" that set forth
the reasons for adding calcium and magnesium to a sports drink
formulation.  While SVC failed to produce a version of this

document dating from 2002, an updated March 2009 version

trumpets the advantages of including these two minerals:

- "Calcium and magnesium . . . are also lost in sweat and are routinely consumed in sub-optimal quantities by physically active people, especially women.  The excretion of these minerals in urine may also be complicated by dietary intake."

- "Increasing the electrolytes that further promote rehydration (completeness and possibly the speed of rehydration) will enhance the efficacy of the product."

- "Addition of minerals not currently in GTQ [Gatorade Thirst Quencher] will help replace more of what is lost the sweat during exercise."

(DX 88 at SVC 578.)

      22.  In 2003, the year after the original version of this

memorandum was written, SVC's scientists – including Dr.

Horswill – filed a patent application for a sports drink

formulation enhanced with calcium and magnesium.  (PX 11;

Horswill Tr. 110.)  All rights in the patent application were

later assigned to SVC.  (Horswill Tr. 148.)

      23.  The inventors claimed that the formula provides

"superior voluntary fluid consumption and fluid retention" in

comparison to "[c]onventional sports drinks."  (PX 11 ¶¶ 0001,

0004.)  This claimed superiority derived, at least in part, from

the addition of calcium and magnesium to the product.  The

patent application explained how, in addition to sodium and

potassium, "[o]ther electrolytes and minerals play an important

role in rehydration by possibly affecting fluid replacement and

fluid retention," and that "magnesium [and] calcium . . . are some of the more important electrolytes[] involved" in these bodily functions.  "Properly balancing the sodium, potassium, magnesium, calcium and chloride levels will further improve the rehydration properties of the beverage."  (PX 11 ¶ 0008.)

24.  In addition to sodium and chloride at "especially advantageous levels," the application specified that the "beverage of the present invention further preferably includes magnesium."  (PX 11 ¶ 0068.)  "Additionally, calcium preferably is present in the beverage of the present invention."  (PX 11 ¶ 0069.)

25.  With its patent application on file, Project Margarita came to fruition.  In 2004, SVC launched Gatorade Endurance Formula, the commercial embodiment of the claimed invention. (Horswill Tr. 111, 153-54.)  In addition to containing more sodium and potassium than Gatorade Thirst Quencher, Gatorade Endurance Formula also contained small amounts of calcium and magnesium.  (DX 176; Urban Tr. 70; Horswill Tr. 111-12.)

26.  At the hearing, SVC asserted that it "ha[s] never claimed that calcium and magnesium provided any benefits of a sports drink, any of the four key benefits that you will hear about[,] or made our product better." (Weinberger Tr. 11-12.) SVC witnesses also claimed that "calcium and magnesium, from a performance perspective, were never used as a marketing tool"

(Urban Tr. 85), that SVC did not "promote the calcium or magnesium in Endurance as providing any of the four benefits or functions of a sports drink" (Horwsill Tr. 116), and that SVC did not tout calcium or magnesium as contributing to Gatorade Endurance Formula's completeness (Stachenfeld Tr. 217).

27.   However, the evidence indicates that SVC indeed promoted calcium and magnesium as providing functional benefits to consumers.  For example, in its public communications about Gatorade Endurance Formula, SVC provided a table highlighting the fact that Gatorade Endurance Formula contains sodium, potassium, calcium, and magnesium, while Gatorade Thirst Quencher contains only sodium and potassium.  (DX 118; Urban Tr. 54-55.)  A version of this chart continues to appear on the packaging of every canister of the powdered version of Gatorade Endurance Formula.  (DX 176.)

28.   In addition, at the time of the product's launch, SVC disseminated marketing literature to the "influencer" community – athletic coaches and trainers – that proclaimed that "the Gatorade Endurance Hydration Formula is designed to help endurance athletes more effectively replace the electrolytes lost in sweat.  One such flyer states that "[t]he *Gatorade Endurance Hydration Formula* contains sodium, chloride, potassium, magnesium and calcium, key electrolytes lost in sweat."  (DX 82 at SVC 7129 (emphasis in original); Horswill Tr.

14

170-71.)  SVC also represented that such claims were supported
by sound science:  "Gatorade Endurance Hydration Formula
contains a <u>five-electrolyte blend of sodium, chloride,</u>
<u>potassium, calcium and magnesium and a 6% carbohydrate solution</u>.
Our research shows that this electrolyte blend will help elite
and endurance athletes stay hydrated and replenished when they
need it most – in longer, more intense training sessions."  (DX
82 at SVC 7126 (emphasis in original).)

29.  SVC sang the praises of calcium and magnesium in other
public communications as well.  A two-page promotional brochure
that was available on the Gatorade.com website described
Gatorade Endurance Formula as containing "a five electrolyte
blend . . . to more fully replace what athletes lose in sweat. .
. ."  (DX 81.)

30.  The current label on packets of Gatorade Endurance
Formula states that "[t]he 170 milligrams of sodium and four
other electrolytes put back more of what you lose so you can
stay better hydrated and perform your best."  (DX 177; Urban Tr.
57.)

31.  SVC's (now defunct) website for Gatorade Endurance
Formula – at www.enduranceformula.com – went further still.
That website, which was operational at least through 2008,
stated that calcium and magnesium, "(which are lost in very
small, but essential amounts in sweat) help maintain the

hydration status of muscle cells as well as playing an important role in many other body functions." (DX 146 at SVC 8022; Urban Tr. 60.)

32. Indeed, as recently as April 2009, the Gatorade.com website explicitly advertised that the calcium and magnesium in Gatorade Endurance Formula provide a performance benefit. Under a heading about potassium, calcium, and magnesium, SVC claimed that these added electrolytes are "vital for proper nerve transmission and muscle contraction." (DX 66; Urban Tr. 57-63.) The page was available on the Gatorade.com website until approximately April 6, 2009 – a week before SVC filed this lawsuit. (Tr. 332-33.)

33. On cross-examination, Mr. Urban testified:

Q. Your company has not only told consumers that Endurance Formula contains the ingredients calcium and magnesium, it has advertised that those ingredients contribute to the benefits that the product delivers, correct?

A. Correct.

(Urban Tr. 56.)

### *SVC's Plans to Launch Gatorade ION+*

34. By December 2008, SVC had caught wind of Coca Cola's plan to introduce Powerade ION4 and was mulling its options about how to respond. (Urban Tr. 64-65.) SVC's planned response was to erase the point of difference by introducing its

own sweat-emulating reformulation of Gatorade Thirst Quencher before Coca-Cola could launch Powerade ION4.

35.   This move was endorsed by SVC's scientists, including Dr. Horswill.  In a December 18, 2008 memorandum entitled "Science Recommendations for the ION4 Defense," Dr. Horswill recommended "using EF [Gatorade Endurance Formula] levels of Mg and Calcium in Gatorade [Thirst Quencher]."  As he put it, "Besides stopping the PA [Powerade] marketing campaign, we can leverage the EF [Gatorade Endurance Formula] history and say that PA [Powerade] is coming late to the electrolyte party." (DX 68; Horswill Tr. 161-62.)

36.   SVC's marketers agreed.  According to other internal SVC documents, the "Key Opportunity" for this product – to be called "Gatorade ION+" – was to serve as SVC's "Competitive defense against ION4" by blunting any marketing advantage Coca Cola might achieve.  (Urban Tr. 66-68; DX 152, DX 154.)

37.   Senior executives within SVC greenlighted the reformulation project in late January 2009.  (DX 93; Urban Tr. 77.)  Gatorade ION+ was to include calcium and magnesium in amounts virtually identical to the amounts present in Powerade ION4.  (Urban Tr. 78-79.)  SVC began planning for the necessary labeling and advertising changes to put this plan into action. (Urban Tr. 77; DX 93.)

38.   In early February 2009, however, the Gatorade ION+ project ran into an unexpected roadblock when the company experienced a shortage in its supply of calcium.  (Urban Tr. 81-83.)  In an e-mail dated February 5, 2009, an SVC marketing executive delivered "New news that R&D team received/uncovered today – right now PepsiCo is experiencing a Calcium ingredient shortage."  (DX 94.)  According to the e-mail, another PepsiCo beverage, Propel, was "having challenges sourcing" calcium, and "the Gatorade quantity needed for the conversion of G base formula would well exceed the Calcium that Propel is looking for.  If we need to find another Calcium source . . . it will likely delay the project a minimum of 2 weeks and more likely 4 weeks."  (DX 94.)  In other words, due to lack of calcium supply, Gatorade ION+ could not be rolled out until after the anticipated launch of Powerade ION4.

39.   Following this news, SVC scrapped the Gatorade ION+ reformulation project.  (Urban Tr. 82-85.)  On the direction of SVC's lawyers, SVC also began to purge its advertising – including its website – of positive references to calcium and magnesium.  (Urban Tr. 64, 68-69.)  On or about April 6, 2009, SVC changed its website to remove the statement that calcium and magnesium are "vital for proper nerve transmission and muscle contraction."  (DX 66; Urban Tr. 64; Tr. 332-33.)

40.   On March 25, 2009, SVC issued new "talking points" approved by its legal department to guide its spokespeople on how to respond to Powerade ION4.  (DX 91; Urban Tr. 68-69.)  The message in the new talking points instructed SVC spokespeople to state that calcium and magnesium are not important in a sports drink:

> Besides sodium, sweat contains only small amounts of potassium and trace amounts of other electrolytes like copper, zinc, calcium and magnesium.  It is not necessary to replace these trace amounts during activity because such small amounts are already available to the body through its stores which are easily replaced through a nutritious diet.

(DX 91.)  The document further instructed SVC representatives to dismiss Powerade ION4 as "marketing hype" because it "contains immaterial levels of electrolytes that are not necessary to replace with a sports drink."  (DX 91.)

41.   The new talking points left some SVC employees bewildered.  In a March 26, 2009 e-mail, an SVC marketing executive wrote that "with Endurance Formula we tout the greater level of potassium as well as trace amounts of magnesium (3 milligrams) and calcium (6 milligrams). . . .  So it seems like some of the points in this document contradict what we say about one of our products because now we're saying that magnesium, calcium, and potassium really don't matter?"  (DX 70; Urban Tr. 72-73.)  Another marketing executive responded, calling the question "a valid point."  (DX 70; Urban Tr. 74.)

42. Likewise, another senior member of SVC's sports marketing group, expressed "concern" about the talking points, specifically that "we've backtracked and are now ignoring our Endurance Formula messaging that a five-electrolyte blend is formulated to replace the fluids and electrolytes lost in sweat . . . ." (DX 69; Horswill Tr. 162-63.)

43. SVC's current position is that the concentrations of calcium and magnesium found in Powerade ION4 "provide no material benefit" to consumers. (Horswill Decl. ¶ 21; Horswill Tr. 115-16; Stachenfeld Decl. ¶¶ 2, 7, 11-13.) Dr. Stachenfeld states "there is nothing in the scientific literature that indicates a benefit to replacing the miniscule amounts of calcium and magnesium lost in sweat during regular exercise through a sports drink." (Stachenfeld Decl. ¶ 11.)

44. Dr. Madden also testified that the levels of calcium and magnesium present in Powerade ION4 do not aid in hydration and probably do not provide any functional benefit to consumers. (Madden Tr. 240-43.)

### The Powerade ION4 Launch and Advertising Campaign

45. In late March 2009, Coca-Cola introduced Powerade ION4 to the market. (Bracken Decl. ¶ 17; Urban Tr. 28.)

46. Mr. Bracken testified that the Powerade ION4 campaign was designed from the outset to proceed in two phases. (DX 158; Bracken Decl. ¶ 13; Bracken Tr. 268-69.) The first "Seed" phase

was designed to be "competitive in nature" (DX 158) because
"Gatorade Thirst Quencher is the largest shareholder of the
category and [thus] if [Coca Cola was] going to grow the brand
Powerade, [] it would have to be by comparing [Powerade ION4] to
Gatorade." (Bracken Tr. 269.) Following these initial
comparative ads would be a second, "Launch" phase, "designed to
focus only on Powerade ION4, and to more fully explain why the
science behind Powerade ION4 makes it an advanced product and
the next step in the evolution of sports drinks." (Bracken
Decl. ¶ 16.)

47. As laid out in the marketing plan, the comparative ads
of the "Seed" phase were intended to be of short duration –
specifically, no more than 60 days. (DX 158.) This was for two
reasons: first, "so as not to give prolonged free publicity" to
Gatorade (Bracken Decl. ¶ 15), and second, because retailers
"don't like it when brands within a category just compete at one
another." (Bracken Tr. 269.)

48. As part of the "Seed" phase of the Powerade ION4
launch, Coca-Cola launched an aggressive advertising blitz
attacking Gatorade head-on. The advertising campaign spanned
several media channels, including print, billboard, point-of-
sale, internet, and product packaging advertising.

49. During the first week of April 2009, Coca-Cola ran an
advertisement on the front cover and inside cover spread of the

April 6, 2009 issue of <u>ESPN Magazine</u>.  (PX 1, 1A.)  The cover of

the magazine contains a half-page flap that is blank-white,

except for the title of the magazine and the text: "(YOU

WOULDN'T SETTLE FOR AN INCOMPLETE COVER)."  (PX 1, 1A.)  When

the flap is unfolded, it reveals the complete cover page and the

inside of the flap, which depicts half of a bottle of Gatorade.

The text at the top of the inside flap reads:  "THEN DON'T

SETTLE FOR AN INCOMPLETE SPORTS DRINK."  (PX 1, 1A.)  At the

bottom of the inside flap, an arrow points to the half Gatorade

bottle, followed by the text:

> MISSING TWO ELECTROLYTES*
> Ca CALCIUM   Mg MAGNESIUM
> *GATORADE THIRST QUENCHER.

(PX 1, 1A.)

    Inside the front cover of the magazine is a two-page spread

advertising Powerade ION4.  The left-hand page reads:

> INTRODUCING
> THE COMPLETE
> SPORTS DRINK
> POWERADE
> ION4TM ADVANCED ELECTROLYTE SYSTEM
> COMPLETE WITH 4 ELECTROLYTES IN THE
> SAME RATIO TYPICALLY LOST IN SWEAT
> Na SODIUM  K POTASSIUM  Ca CALCIUM  Mg MAGNESIUM
>
> UPGRADE YOUR FORMULA.  UPGRADE YOUR GAME.

(PX 1, 1A.)  The right-hand page displays a full bottle of

Powerade ION4.  (PX 1, 1A.)

50.  Coca-Cola ran another print advertisement similar to the ESPN Magazine cover advertisement in the March 30-April 5, 2009 issue of Sports Business Journal, a sports marketing industry publication.  (PX 3; DX 163; Urban Tr. 31-32.)  Coca-Cola ran a third version of the print advertisement in the March 2009 issue of STACK magazine, a sports publication targeted at high school athletes.  (PX 2.)  The text of the STACK ad differs slightly from the ESPN Magazine and the Sports Business Journal ads in that it uses the word "critical" to describe those electrolytes present in Powerade ION4, as well as the two electrolytes not present in Gatorade:  "MISSING TWO CRITICAL ELECTROLYTES*" and "COMPLETE WITH 4 CRITICAL ELECTROYTES IN THE SAME RATIO TYPICALLY LOST IN SWEAT."  (PX 2.)

51.  As part of the advertising campaign for ION4, Coca-Cola also erected a series of billboard advertisements that directly compared Powerade ION4 to Gatorade.  (Urban Tr. 32-33.) As an apparent sophomoric gesture hardly calculated to attract new consumers of Powerade ION4, Coca-Cola also placed one of the billboard ads on the outside of a building across from Gatorade's corporate offices in Chicago, Illinois.  (Urban Tr. 32-33.)

52.  One example of the Powerade ION4 billboard advertising is actually a display of two billboards on opposite sides of a highway.  The first billboard in the series shows the half-

bottle of Gatorade on the one side, the other side of the billboard left uncovered, and the text "DON'T SETTLE FOR AN INCOMPLETE SPORTS DRINK" emblazoned above the Gatorade bottle. Below this, an arrow points to the bottle with the same "MISSING TWO ELECTROLYTES*" message found in the magazine flap ads.  (PX 4; Urban Tr. 32-33.)  The other billboard shows a full bottle of Powerade ION4, along with the text:  "INTRODUCING THE COMPLETE SPORTS DRINK WITH ION4."  (PX 4; Tr. 33.)

53.  Coca-Cola also worked the "incomplete" theme into a relaunch of the Powerade website, available online at www.us.powerade.com.  (Urban Tr. 34.)  Visitors to the relaunched website were first greeted with a full blank page labeled "COMPLETE WEBSITE," quickly followed by a half-sized blank page with a "loading" note, which was labeled "INCOMPLETE WEBSITE" and contained the statement "YOU WOULDN'T SETTLE FOR AN INCOMPLETE WEBSITE."  After a few seconds, the website visitors were directed to a page showing half of an unlabeled sports drink bottle that closely resembles Gatorade, in conjunction with text "THEN DON'T SETTLE FOR AN INCOMPLETE SPORTS DRINK," and the "MISSING TWO ELECTROLYTES*" message.  (PX 7; Urban Tr. 34-35.)  Finally, visitors were redirected to the website's main page showing a full bottle of Powerade ION4 and the slogan "THE COMPLETE SPORTS DRINK."  (PX 7A; Urban Tr. 35.)

54.   On March 24, 2009, SVC sent a letter to Coca-Cola
demanding that they immediately cease all false advertising for
Powerade ION4.   (PX 27.)

55.   On April 13, 2009, SVC filed this action and sought a
preliminary injunction.

56.   The comparative ads were discontinued in early May
2009, within the 60-day period originally contemplated in the
marketing plan.   (Bracken Decl. ¶ 19; Bracken Tr. 280-81.)
Certain comparative ads in ESPN Magazine and on ESPN-operated
websites were discontinued even earlier because "ESPN indicated
that Gatorade had called ESPN sales folks and threatened to
withdraw millions of dollars of advertising if [ESPN] didn't
pull the comparative advertisements immediately.  And then
[ESPN] told [Coca-Cola] that they would no longer accept any of
the comparative advertisement[s]."  (Bracken Tr. 279.)

57.   Coca-Cola also removed the word "critical" from
digital advertising materials and from bus shelters.  (Bracken
Tr. 311.)  The word "critical" also appears to have been dropped
in Coca-Cola's print advertising between the March 2009 Stack
magazine ad and the March 30-April 5, 2009 Sports Business
Journal ad and the April 2009 ESPN Magazine ad.  (PX 1, PX 1A,
PX 2, PX 3.)

58.   Bracken testified that Coca-Cola has no plans to
resume these comparative advertisements at any time in the

future, and has committed not to resume these ads, or to run any
other ads stating that Gatorade is "incomplete" or "missing two
electrolytes," while this lawsuit is pending.  (Bracken Tr. 281;
Bracken Decl. ¶ 20.)  Mr. Bracken testified that there is "no
chance" of Coca-Cola running such ads during the pendency of
this action, and that the company is "committed not to run
that."  (Bracken Tr. 281.)

59.  Coca-Cola's current ads, however, continue to
reference Powerade ION4 as "THE COMPLETE SPORTS DRINK" and
"COMPLETE."  (Tr. 37.)  The current label for Powerade ION4
reads: "POWERADE's® advanced system replenishes 4 critical
electrolytes in the same ratio typically lost in sweat.  Other
sports drinks don't.  This is the evolutION4 of sports drinks.
Upgrade your formula.  Upgrade your game."  (PX 8; DX 178.)  In
the "Nutrition Facts" box of the label, it states that the
product is "[n]ot a significant source of . . . calcium . . . ."
(PX 8; DX 178.)

60.  On June 15, 2009, Coca Cola finalized and approved a
new label for Powerade ION4.  (Bracken Supp. Decl. ¶ 5.)  In
place of the copy quoted above, the revised label states that
"The ION4TM Advanced Electrolyte System helps replenish 4
electrolytes lost in sweat.  And POWERADE® is formulated with a
6% carbohydrate solution and Vitamins B3, B6 & B12 to help
provide energy to working muscles."  (Bracken Supp. Decl. ¶ 4.)

The "Nutrition Facts" box on the new label states that the product is "[n]ot a significant source of . . . calcium [and] magnesium . . . ." (Bracken Supp. Decl. ¶ 5.)

61.   Coca-Cola states that the process of printing the new labels, delivering them to Coca-Cola's bottling facilities, affixing the new labels to the product, and shipping the product will take approximately 60 days.   Coca-Cola states that it therefore expects Powerade ION4 bottles bearing the new label to begin to appear in the market by mid- to late-August 2009. Coca-Cola explains, however, that because retailers replace inventory only as the product is sold, bottles of slower-selling sizes or flavors may take longer to be replaced than faster-selling ones.   (Bracken Supp. Decl. ¶ 6; Bracken Tr. 329-32.)

## CONCLUSIONS OF LAW

### A.

1.   The standards that govern the issuance of a preliminary injunction are well established.   "A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in

the movant's favor."  <u>Doninger v. Niehoff</u>, 527 F.3d 41, 47 (2d
Cir. 2008).

**B.**

2.   SVC seeks a preliminary injunction on its false
advertising claims and on its trademark dilution by tarnishment
claim.  It does not seek preliminary injunctive relief on its
remaining claims, namely, its claims for deceptive acts and
practices, injury to business reputation, and unfair
competition.  SVC asserts that it has shown a likelihood of
succeeding on the merits of both its false advertising claims
and its trademark dilution claim.

3.   SVC brings false advertising claims pursuant to the
federal Lanham Act, 15 U.S.C. § 1125(a), challenging four
specific advertising claims made by Coca-Cola about Powerade
ION4 that SVC claims are false:

(1)   the claim that Powerade ION4 is "THE COMPLETE
SPORTS DRINK" and "COMPLETE," while Gatorade is "INCOMPLETE" and
"MISSING" "CRITICAL" electrolytes, namely, calcium and
magnesium;

(2)   the claim that ION4 "replenishes 4 critical
electrolytes in the same ratio typically lost in sweat.  Other
sports drinks don't";

(3)   the description of calcium and magnesium as
"critical" electrolytes; and

28

    (4)  the use of the slogan "UPGRADE YOUR FORMULA. UPGRADE YOUR GAME."

    4.  SVC also claims that Coca-Cola's advertisements which show half a bottle of Gatorade constitutes trademark dilution by tarnishment in violation of the federal Lanham Act, 15 U.S.C. § 1125(c), as well as New York General Business Law § 360-l.

    5.  SVC's request for preliminary injunctive relief barring Coca-Cola from advertising that Gatorade is "incomplete" and "missing" two electrolytes is now moot, in light of the fact that the ads comparing Powerade ION4 to Gatorade were discontinued in May 2009, and Coca-Cola has committed not to resume those ads during the pendency of this lawsuit. Similarly, because Coca-Cola is no longer running ads that feature the half-bottle of Gatorade, or any other Gatorade trademarks or logos, SVC's request for injunctive relief based on alleged trademark dilution by tarnishment is also moot.

    6.  SVC argues that its request to enjoin Coca-Cola from running these ads is not moot because Coca-Cola's alleged record of following a "cheat and retreat" strategy evinces bad faith and a likelihood that it will resume the ads.  However, SVC's fear that Coca-Cola will resume the ads is speculative at best and does not warrant a preliminary injunction in light of Coca-Cola's sworn declarations and testimony under oath that it will not resume the ads during the course of this litigation.  See Do

The Hustle, LLC v. Rogovich, No. 03 Civ. 3870, 2003 WL 21436215, at *7 (S.D.N.Y. June 19, 2003) (holding that "speculative fears ascribing dishonesty" to defendant's assurances that he would not resume allegedly unlawful actions were not "immediate enough to justify the extraordinary remedy of a preliminary injunction"). Coca-Cola's cessation of the ads and its commitment not to run such ads during the pendency of this lawsuit obviates the need for a preliminary injunction on these issues because SVC cannot show any likelihood of irreparable injury without the preliminary injunction. See Int'l Gemmological Institute, Inc. v. Indep. Gemological Labs, Inc., No. 00 Civ. 4897, 2000 WL 1278179, at *1 (S.D.N.Y. Sept. 7, 2000) (finding no threat of irreparable harm where defendant voluntarily ceased the challenged conduct and represented that the conduct would not resume). It is unreasonable to believe that Coca-Cola would resume the ads that it has undertaken not to run during the pendency of the lawsuit while this lawsuit is pending, and a preliminary injunction is a remedy that is directed toward preventing conduct during the pendency of the lawsuit.

7.   With respect to the remaining false advertising claims, SVC has failed to show a likelihood of success on the merits because SVC has not shown a likelihood of proving that the any of the claims are false.

30

8.   Section 43(a) of the Lanham Act provides, in pertinent part, that:

> Any person who, on or in connection with any goods or services . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which-
>
> . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

9.   Two types of advertising claims are actionable under Section 43(a):  (i) advertisements that are false on their face, known as "literally false" claims, and (ii) advertisements that, though literally true, are likely to mislead and confuse consumers, known as "implied claims."  See S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001); Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992). Literal falsity claims encompass claims that an advertisement is "false by necessary implication."  Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 158 (2d Cir. 2007).  Under the false by necessary implication doctrine, "[i]f the words or images, considered in context, necessarily imply a false message, the advertisement is literally false and no extrinsic evidence of consumer confusion is required."  Id.  However,

31

where the language of an advertisement is "susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." Id. A plaintiff may bring an implied claim on the ground that the advertisement although literally true is nonetheless misleading, but it must offer consumer data or other extrinsic evidence to show that the audience to which the advertisement is directed is in fact misled by the advertisement. Id.

### "The Complete Sports Drink"

10. First, SVC has failed to prove that the Powerade ION4 slogan, "The Complete Sports Drink," is literally false.

11. SVC concedes that Powerade ION4 is "a complete sports drink." Its objection to the slogan is limited to the word "The". Jeffrey Urban, the Senior Vice President for Sports Marketing for Gatorade, testified as follows:

> Q.  With respect to [the claim] that Powerade ION4 is a complete sports drink, we can agree, can we not, that Powerade ION4 is a complete sports drink, right?
>
> A.  We can agree on that, yes.
>
> Q.  And your objection is to the semantic difference between the word "the" on the one hand and "a" on the other hand at the beginning of that marketing claim, right?
>
> A.  I would agree that – I wouldn't sort of put it as whimsically as you do, but I would say that "the" is a pretty powerful word in this articulation.
>
> Q.  And you think the distinction between "the" and "a" in this instance makes a difference?

A.   I do and we do, yes.

Q.   You think it makes the claim false, right?

A.   I do.

(Urban Tr. 43-44.)

12.   The addition of "The" to "Complete Sports Drink" is non-actionable puffery.  Claims that a product is "The" something-or-other is commonly viewed as puffery, because consumers understand that the advertiser is not contending that the particular attribute or feature can only be found in its product.  See, e.g., Cooks, Perkiss and Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246 (9th Cir. 1990) (holding that the claim "We're the low cost commercial collection experts" is puffery); Cytyc Corp. v. Neuromedical Sys., Inc., 12 F. Supp. 2d 296, 300-01 (S.D.N.Y. 1998) (finding statement describing pap smear test as "the new 'Gold Standard' for cytology laboratories" to be puffery).  Where "no reasonable buyer would take [the representation] at face value, there is no danger of consumer deception and hence, no basis for a false advertising claim."  Time Warner Cable, Inc., 497 F.3d at 159 (citations and internal quotation marks omitted).

13.   Moreover, the Court of Appeals for the Second Circuit has recognized that advertising terms like "complete" are puffery because they are subjective and cannot be proven true or

33

false.  See, e.g., Lipton v. Nature Co., 71 F.3d 464, 474 (2d
Cir. 1995) (use of "thoroughly" in statement "thoroughly
researched dozens and dozens of animals" is puffing).  Here,
SVC's expert admitted that there is no scientific consensus on
the meaning of "complete" in the context of a sports drink
(Stachenfeld Tr. 215-16.)  Coca-Cola's expert agreed that there
is no applicable standard, and that the meaning of the term
"complete" in relation to a sports drink is "[c]ertainly open to
interpretation."  (Madden Tr. 234.)  Because the word "complete"
is in the context of sports drinks an ambiguous term, it is
puffery which cannot be proven false.  Moreover, the addition of
"The" to "Complete" adds puffery upon puffery.  As the Court of
Appeals for the Second Circuit recently remarked:  "The
'puffing' rule amounts to a seller's privilege to lie his head
off, so long as he says nothing specific."  Time Warner Cable,
Inc., 497 F.3d at 159.

        14.  SVC argues that Coca-Cola's advertisements referring
to Powerade as "THE COMPLETE SPORTS DRINK" and "COMPLETE" make
literally false comparative claims between Powerade ION4 and
Gatorade even though the ads deeming Gatorade "INCOMPLETE" have
ceased to run, and the current ads contain no mention of
Gatorade.  According to SVC, Coca-Cola's previous ads which
explicitly compared Powerade ION4 to Gatorade have so
infiltrated the minds of consumers that the ads have "poisoned

the well" and have primed consumers to understand the current ads as communicating that Gatorade is incomplete.  <u>See, e.g.</u>, <u>U-Haul Int'l, Inc. v. Jartran, Inc.</u>, 601 F. Supp. 1140, 1144, 1148 (D. Ariz. 1984) ("[a]n advertising campaign-of the type utilized by [defendant] has a life-beyond-publication" as a message from an advertisement "ha[s] substantial carryover effect in the mind of the interested public" and can "remain[]" and "influence consumer decisions long after the newspaper [containing the ad] is consigned to the trash bin"), <u>aff'd in part, modified in part, and rev'd in part on other grounds</u>, 793 F.2d 1034 (9th Cir. 1986).

15.  While the implication that Powerade ION4 is more complete than Gatorade is one message that could be taken from the current Powerade ION4 ads, that is by no means the only reasonable interpretation of the ads.  Reasonable consumers could also read the words "THE COMPLETE SPORTS DRINK" and "COMPLETE" to communicate that Powerade ION4 is a complete sports drink, a proposition that SVC admits is literally true.  The current ads do not necessarily imply a comparison to Gatorade, and therefore SVC's false by necessary implication claim is not likely to succeed on the merits.

16.  Moreover, there is no evidence that any comparison to Gatorade is false.  The parties agree that Gatorade does not contain calcium and magnesium.  But Coca-Cola does not claim in

its advertising for Powerade ION4 that either calcium or magnesium provides any benefit other than the fact that they are added, for whatever that is worth.  Pointing out a fact that is true although meaningless does not support a literal falsity claim.  It could support an implied falsity claim, but implied falsity claims require extrinsic evidence to show that consumers are in fact being misled.  See Time Warner Cable, Inc., 497 F.3d at 153; Johnson & Johnson * Merck Consumer Pharm. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 297 (2d Cir. 1992).  If SVC's claim is that Coca-Cola's advertising misleadingly implies that Gatorade is less effective because it lacks calcium and magnesium, it must show evidence that consumers view the ads as communicating that misleading impression.  However, as SVC conceded at the preliminary injunction hearing, SVC has not conducted any research to produce such evidence, even though it has the capability and resources to do so.  (Urban Tr. 45-46.) It is significant that there is no evidence that even a single consumer has been deceived by any advertisement for Powerade ION4.  In the absence of such extrinsic evidence, SVC has failed to show that it is likely to succeed on its implied falsity claim.

17.  SVC tries to sidestep the extrinsic evidence requirement for implied falsity claims by arguing that Coca-Cola's "egregious intent" warrants a presumption that consumers

have been misled or deceived.  See Johnson & Johnson * Merck
Consumer Pharm. Co., 960 F.2d at 298-99 ("'[W]here a plaintiff
adequately demonstrates that a defendant has intentionally set
out to deceive the public,' and the defendant's 'deliberate
conduct' in this regard is of an 'egregious nature,' a
presumption arises 'that consumers are, in fact, being
deceived.'" (quoting Res. Developers, Inc. v. Statue of Liberty-
Ellis Island Found., Inc., 926 F.2d 134, 140 (2d Cir. 1991))).

       18.   None of the evidence elicited at the hearing rises to
the high level required to show the kind of "egregious"
misconduct required to meet this standard.  SVC points largely
to internal documents which they allege reveal Coca-Cola's
insidious attempt to portray Powerade ION4 as a "better sports
drink" than Gatorade.  These internal documents, many of them
PowerPoint decks which were used within Coca-Cola during the
planning process for the launch of Powerade ION4, contain
"locker room type banter" and other boorish comments directed at
Gatorade, which Mr. Bracken testified were "meant to rally the
troops" and "to fire the guys up in anticipation of a product
launch." (Bracken Tr. 289-90; PX 14, 16-18.)  The documents
reflect that Coca-Cola intended to take an aggressive stance,
but the documents do not indicate any egregious intent to
deceive or mislead consumers into believing that Gatorade is a
less effective product because it lacks calcium and magnesium.

19.   The only evidence of possible misconduct on Coca-
Cola's behalf is its decision to call Gatorade "incomplete" in
its advertisements after Dr. Madden "expressed concern that a
consumer might view [the language "incomplete"] as saying that
Gatorade was not as functional as Powerade."  (Madden Tr. 232-
33.)  Mr. Bracken testified that he discussed Dr. Madden's
concerns with her, but that he ultimately concluded that the
advertisements were truthful and explained on their face what
was meant by "incomplete" – that Gatorade does not contain
calcium and magnesium.  (Bracken Tr. 275-77.)  The fact that
Coca-Cola's marketing team decided to proceed with the
"INCOMPLETE" advertisements does not suggest that it had an
egregious intent to mislead or deceive consumers even with
respect to the "INCOMPLETE" ads, which are no longer at issue on
this motion, much less that it had such an intent with respect
the current ads, which do not refer to Gatorade at all and which
only describe Powerade as "THE COMPLETE SPORTS DRINK" and
"COMPLETE."

**"Replenishes 4 critical electrolytes in the same ratio typically
lost in sweat.  Other sports drinks don't."**

20.   The "ratio claim," the claim that Powerade
"replenishes 4 critical electrolytes in the same ratio typically
lost in sweat," is literally true.  Coca-Cola derived this
slogan from the ACSM Position Stand, which reported the average

38

losses of sodium, potassium, calcium and magnesium in human sweat.  (Madden Tr. 227-28.)  SVC does not question the accuracy of the ACSM Position Stand or the average electrolyte losses reported in it.  (Stachenfeld Tr. 198.)

21.  Powerade ION4 contains sodium, potassium, calcium, and magnesium in the same ratio between the average electrolytes losses reported in the ACSM Position Stand.  (Madden Tr. 230.) The parties agree that no other sports drink contains these four electrolytes in that ratio.  (Stachenfeld Tr. 204; Madden Tr. 230, 232.)

22.  SVC argues instead that the ratio claim is literally false because sweat loss varies from person to person, and varies even for a single individual.  However, Coca-Cola does not claim that everyone sweats the same, that the electrolyte composition of every individual's sweat is always identical, or that electrolytes in sweat are lost in a "constant" or "exact" ratio.  The ads simply refer to the ratio of electrolytes "typically lost in sweat," and truthfully report that Powerade ION4 contains those electrolytes in that "same ratio."  As SVC's expert agreed, although the word "typical" is not a "scientific term" (Stachenfeld Tr. 195-96), in lay parlance, words like "average," "typically," and "usually" are often synonymous (Stachenfeld Tr. 195).  Accordingly, the ratio claim is

literally true.  The fact that this statement is meaningless
does not make it literally false.

### Describing Calcium and Magnesium as "Critical"

23.  SVC also contends that the reference to "4 critical
electrolytes" is false because calcium and magnesium are not
"critical" to the functionality of sports drinks.  However, the
ratio claim does not state that calcium and magnesium are
"critical" to hydration or are "critical" sports drink
ingredients; it simply describes them as "critical," for
whatever that is worth.  SVC does not dispute that calcium and
magnesium are vital to the human body.  Therefore, the portion
of the ratio claim referring to calcium and magnesium as
critical is not literally false.

### "Upgrade your formula.  Upgrade your game."

24.  SVC contends that the tagline "Upgrade your formula.
Upgrade your game" (the "upgrade claim") that appears on the
current label for Powerade ION4 is literally false.  First, SVC
asserts that the upgrade claim is intended to suggest a
comparison to Gatorade Thirst Quencher, which lacks calcium and
magnesium.  (Bracken Tr. 312-14; Madden Tr. 254.)  However, on
its face, the tagline makes no such comparison.  The "Upgrade
your formula" portion of the tagline claims only that it is an
upgraded formula.  Both parties agree that Powerade ION4 is an
upgrade over the previous formulation of Powerade in that

Powerade ION4 contains about twice as much sodium as the previous version of Powerade.  (Urban Tr. 47; Madden Tr. 253.) Thus, the upgrade claim is not literally false.

25.  Nor is the upgrade claim false by necessary implication.  Reasonable consumers could read the upgrade claim to be making comparative statements about Gatorade, but they could also read the upgrade claim to be comparing Powerade ION4 to the old Powerade.  See, e.g., Time Warner Cable, Inc., 497 F.3d at 158 ("if the language . . . is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false"); see also Scotts Co. v. United Indus. Corp, 315 F.3d 264, 275 (4th Cir. 2002) (rejecting literal falsity argument because the advertisement "can reasonably be understood as conveying different messages").  Because reasonable consumers could understand the ads to communicate the truthful claims stated on their face, they cannot be held to "necessarily imply" an alternative message.

26.  While there was evidence offered that Coca-Cola intended this phrase to suggest a comparison to Gatorade Thirst Quencher, which lacks calcium and magnesium (Bracken Tr. 305, 314; Madden Tr. 254), both Dr. Madden and Mr. Bracken also testified that the upgrade claims were also meant to convey that Powerade ION4 was an "upgrade" from old Powerade as well. (Madden Tr. 253-54; Bracken Tr. 305.)  This intent is consistent

with the literal text of the advertisement, which could reasonably be read to compare Powerade ION4 to either Gatorade or the old Powerade.  However, even if it could be shown that Coca-Cola intended only to compare Powerade ION4 to Gatorade, proof of that intent would not be dispositive because the text of the upgrade claim does not necessarily imply the allegedly false statement.

27.  The "Upgrade your game" portion of the tagline is also literally true.  There is no dispute between the parties that drinking both Gatorade and Powerade ION4 provides consumers with hydration and performance benefits.  (Urban Tr. 48.)  To the extent that SVC argues that this statement necessarily implies that Powerade ION4 will provide consumers with more hydration and performance benefits than Gatorade, a proposition that SVC contends would be false, that argument fails, because the tagline is amenable to other reasonable interpretations.  One reasonable reading of the slogan is that it is meaningless rhetoric, exhorting consumers to "Upgrade your game."  It could also be read to imply the literally true statement that Powerade ION4, like any other sports drink, offers hydration and performance benefits.  In any event, the tagline is too vague and non-specific to conclude that it necessarily implies a direct comparison to Gatorade.

28.   Moreover, the claim "Upgrade your game" is also
puffery.  The claim is exaggerated and boastful, and no
reasonable consumer, having read the slogan, would be justified
in believing that it would actually result in improved athletic
abilities, such as playing a better game of basketball.  See,
e.g., Time Warner Cable, Inc., 497 F.3d at 160 (an
"'exaggerated, blustering, and boasting statement upon which no
reasonable buyer would be justified in relying'" is puffery)
(quoting Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d
489, 497 (5th Cir. 2000)); Southland Sod Farms v. Stover Seed
Co., 108 F.3d 1134, 1145 (9th Cir. 1997) (holding that statement
"Less is More" was "generalized boasting upon which no
reasonable buyer would rely").

29.   The tagline is also puffery in that any claim of
superiority that could be implied by it would be vague and non-
specific.  See Time Warner Cable, Inc., 497 F.3d at 160 ("a
general claim of superiority over comparable products that is so
vague that it can be understood as nothing more than a mere
expression of opinion" is puffery) (quoting Pizza Hut, 227 F.3d
at 497); Lipton, 71 F.3d at 474.  The tagline does not say that
Powerade ION4 will upgrade consumers' game by a specific amount,
nor does it claim that it will upgrade their game in any
particular way.  Without any language that could be read to make
a specific or measurable superiority claim, the "Upgrade your

43

formula.  Upgrade your game" statement is puffery and therefore
not actionable.  See, e.g., Cook, Perkiss and Liehe, Inc., 911
F.2d at 246 (holding that statement "we're the low cost
commercial collection experts" was puffery because any
implication that services were superior to that of the
competition was "merely general in nature"); cf. Southland Sod
Farms, 108 F.3d at 1145 (while finding that claim that "Less is
More" was puffery, holding that "50% Less Mowing" claim was
actionable because it was specific and measurable).

30.  Accordingly, SVC has failed to show a likelihood of
success on the merits of its remaining false advertising claims.[1]

**B.**

31.  "[A] showing of probable irreparable harm is the
single most important prerequisite for the issuance of a
preliminary injunction."  Reuters Ltd. v. United Press Int'l,
Inc., 903 F.2d 904, 907 (2d Cir. 1990) (citations and internal
quotation marks omitted).  The plaintiff must establish "that
absent a preliminary injunction [it] will suffer an injury that

---

[1] Nor has SVC met the alternative standard of showing sufficiently
serious questions going to the merits to make them a fair ground for
litigation and a balance of the hardships tipping decidedly in its favor.  As
explained more fully below, SVC has presented no evidence that its brand
equity or sales of Gatorade have suffered since the inception of the Powerade
ION4 campaign, nor has it made any plausible arguments that the current
Powerade ION4 ads are likely to harm the public.  Therefore, SVC has not
shown any hardship on itself that would be alleviated by the injunctive
relief it requests.  Moreover, some of the specific items of injunctive
relief that SVC seeks—corrective advertising and the immediate removal of all
bottles with any offending labels—would unquestionably create some hardship
for Coca-Cola.

is neither remote nor speculative, but actual and imminent."
Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66
(2d Cir. 2007) (citation and internal quotation marks omitted).

32.  SVC argues that it is entitled to a presumption of
irreparable harm on two grounds.  First, SVC cites the law that
once a plaintiff in a false comparative advertising case
demonstrates a likelihood of success on the merits, irreparable
harm is presumed where the parties' products compete, and the
challenged advertisements make comparative claims.  See, e.g.,
McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.2d 34, 38 (2d
Cir. 1988) (irreparable harm "is presumed" because "[a]
misleading comparison to a specific competing product
necessarily diminishes that product's value in the minds of the
consumer"); Time Warner Cable, Inc., 497 F.3d at 162 ("where the
case presents a false comparative advertising claim . . . no
proof of likely injury is necessary").  Even putting aside for
the moment the Court's finding that SVC has not demonstrated a
likelihood of success on the merits, SVC is not entitled to a
presumption of irreparable harm because, as explained above, it
has failed to show that any of Coca-Cola's current ads make
comparative claims.

33.  SVC also argues that irreparable harm should be
presumed because Coca-Cola's allegedly false advertisements
create a danger to public health.  Specifically, SVC maintains

45

that by touting the calcium content in Powerade ION4 and
representing that it is "COMPLETE," the advertisements may cause
consumers to believe falsely that Powerade ION4 provides
nutritionally significant amounts of calcium when it does not,
and therefore drink Powerade ION4 in lieu of important dietary
sources of calcium, putting themselves at increased risk for
calcium deficiency.  According to SVC, female athletes are
particularly vulnerable to the statements in question because
they are particularly concerned about their intake of calcium.

34.  This argument is frivolous.  The Powerade ION4 label
clearly states that it is "[n]ot a significant source of . . .
calcium," and any consumer that was concerned about calcium
intake, including any female consumer, is capable of simply
reading the label and appreciating that Powerade ION4 is not a
significant source of calcium.  No reasonable consumer, male or
female, would view Powerade ION4 as a sufficient source of
calcium.  Moreover, SVC has not indicated that there is even a
single consumer who has come forward to say that he or she was
deceived into thinking that Powerade ION4 was a sufficient
source of calcium.  It would be remarkable indeed if a consumer
were sufficiently concerned about obtaining the necessary daily
requirement of calcium that he or she would drink a sports drink
to obtain it, and yet so unconcerned that he or she would not

even read the label that says the sports drink is not a
significant source of calcium.

35.  SVC also argues that the ratio claim could lead some
consumers to under-hydrate or over-hydrate, resulting in
dehydration or hyponatremia.  This argument is also frivolous.
SVC fails to provide any explanation for how this far-fetched
scenario would even occur.  The ratio on its face does not
communicate anything to consumers about how much Powerade ION4
is necessary to keep hydrated.  No reasonable consumer would
take the ratio claim as a recommendation to drink so little
Powerade ION4 as to become dehydrated, or to drink so much
Powerade ION4 as to suffer hyponatremia.  Unsurprisingly, SVC
has produced no evidence that any consumer has been misled or
deceived into under-hydrating or over-hydrating because he or
she read Coca-Cola's ratio claim.

36.  Because SVC has not shown that any of the claims made
in Powerade ION4's current advertisements are comparative, and
because nothing in those advertisements presents a danger to
public health, SVC is not entitled to a presumption of
irreparable injury.

37.  In the absence of a presumption, the likelihood of
irreparable harm "must be demonstrated in some manner."  Time
Warner Cable, Inc., 497 F.3d at 161.  The plaintiff "must submit
proof which provides a reasonable basis for believing that the

false advertising will likely cause it injury." Id. at 161
(internal quotation marks and citation omitted); see also Marcy
Playground, Inc. v. Capitol Records, Inc., 6 F. Supp. 2d 277,
282 (S.D.N.Y. 1998) ("[T]he movant for a preliminary injunction
must show not only that irreparable injury is possible, but that
it is likely."). Although "a plaintiff need not . . . point to
an actual loss or diversion of sales . . . something more than a
plaintiff's mere subjective belief that [it] is injured or
likely to be damaged" is required. Time Warner Cable, Inc., 497
F.3d at 161.

    38. SVC has not produced any evidence showing a likelihood
of irreparable injury. SVC argues that the current Powerade
ION4 advertising campaign will inevitably lead to loss of
consumer confidence, goodwill, and unquantifiable sales of
Gatorade, and further asserts that "it surely has already"
caused such irreparable injury. (Pl.'s Prop. Findings of Facts
and Conclusions of Law ¶ 41.) However, SVC did not present any
evidence of lost consumer confidence, lost goodwill, or lower
sales of Gatorade and even admitted at the preliminary
injunction hearing that SVC has no evidence that the ratio claim
or the upgrade claim are causing any irreparable injury to SVC.
(Urban Tr. 41, 46-47.) Given SVC's research capabilities and
resources, its failure to present any concrete evidence of harm
or likely harm is striking.

39.   SVC's only evidence in favor of its irreparable harm argument is an internal Coca-Cola study that showed that people's preference for the new Powerade ION4 formulation increased significantly as compared to their preference for both old Powerade and Gatorade once they learned that it contained four electrolytes instead of two.  (PX 21; Bracken Tr. 315-18.) SVC has not presented any evidence, however, that an increase in preference for Powerade ION4 in a controlled study is likely to translate into a loss of consumer confidence, goodwill, or sales in reality.  Moreover, SVC cannot extrapolate harm from allegedly false or misleading ads from the fact that some persons would prefer a sports drink with four electrolytes rather than two electrolytes, a claim that Coca-Cola could plainly make for Powerade ION4, whatever the worth of such a statement.  In the absence of any such evidence, SVC has not met its burden of showing that irreparable harm will ensue if a preliminary injunction does not issue.

**D.**

40.   Finally, Coca-Cola raises the defense that SVC would not be entitled to the equitable relief of a preliminary injunction because SVC has unclean hands.  More specifically, Coca-Cola claims that because SVC has touted the importance of calcium and magnesium in sports drinks for years, and because SVC too planned to introduce a new formulation of Gatorade with

calcium and magnesium, boosted by advertising claims similar to Coca-Cola's, it cannot equitably seek an order enjoining Coca-Cola from doing the same.

41.  It is a "fundamental principle that 'he who comes into equity must come with clean hands.'"  Hermes Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107 (2d Cir. 2000) (quoting Precision Instrument Mfg. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945)).  The idea underlying the doctrine is that "'since equity tries to enforce good faith in defendants, it no less stringently demands the same good faith from the plaintiff.'"  Dunlop-McCullen v. Local 1-S AFL-CIO-CLC, 149 F.3d 85, 90 (2d Cir. 1998) (quoting 11A C. Wright, A. Miller, M. Kane, FEDERAL PRACTICE AND PROCEDURE:  Civil 2d § 2946, at 108 (1995)).

42.  The unclean hands defense applies to Lanham Act claims such as the one presented here.  See, e.g., Apollo Theater Found. v. Western Int'l Syndication, No. 02 Civ. 10037, 2005 WL 1041141, at *16 (S.D.N.Y. May 5, 2005) ("These principles of the doctrine of unclean hands apply with equal force to Lanham Act claims.") (citing Warner Bros., Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir. 1983)); Deere & Co. v. MTD Holdings, No. 00 Civ. 5936, 2004 WL 1794507, at *2 (S.D.N.Y. Aug. 11, 2004) ("[U]nclean hands may be asserted as an affirmative defense to a Lanham Act infringement suit.").

43.   To sustain an unclean hands defense, a defendant must show that the plaintiff has engaged in "inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks." Laugh Factory Inc. v. Basciano, 608 F. Supp. 2d 549, 560 (S.D.N.Y. 2009).

44.   Although SVC complains of Coca-Cola's touting of calcium and magnesium, the evidence at the preliminary injunction hearing demonstrated that SVC too has marketed the advantage of adding calcium and magnesium to Gatorade Endurance Formula.  In fact, some of SVC's claims appear to have gone further in that they suggest that calcium and magnesium provide performance or hydration benefits, whereas Coca-Cola only touts the fact that calcium and magnesium are added, without claiming that they actually do anything for the consumer other than that they replace the trace amounts that are lost in sweat, should any consumer be interested in that fact.  SVC marketed that the calcium and magnesium in Gatorade Endurance Formula "put back more of what you lose, so you can stay better hydrated and perform your best" (DX 177); "help maintain the hydration status of muscle cells as well as playing an important role in many other body functions" (DX 146 at SVC0008022; Urban Tr. 60); and "are vital for proper nerve transmission and muscle contraction" (DX 66; Urban Tr. 57-58, 62-63).

45.   In a similar case, the producer of Haagen-Dazs ice cream sought a preliminary injunction against a competitor, Frusen Gladje, whose packaging allegedly was "intended to deceive the public into believing that their product is made and/or sold in Sweden" when in fact it was produced in the United States.  Haagen-Dazs v. Frusen Gladje, 493 F. Supp. 73, 75-76 (S.D.N.Y. 1980).  But Haagen-Dazs itself engaged in the same alleged misconduct:  although Haagen-Dazs's name suggested its ice cream was Scandinavian in origin, its ice cream was produced in the United States.  The court held that Haagen-Dazs was "guilty of the same deceptive trade practices of which it accuses defendants," and concluded that "since plaintiff's hands are similarly unclean, they may not secure equitable relief . . . ."  Id. at 76.  See also Procter & Gamble Co. v. Ultreo, Inc., 574 F. Supp. 2d 339, 354-56 (S.D.N.Y. 2008) (applying unclean hands doctrine where plaintiff had engaged in advertising virtually identical to the allegedly false advertising of defendant); Havana Club Holding v. Galleon, No. 96 Civ. 9655, 1998 WL 150983 (S.D.N.Y. Mar. 31, 1998) (in suit in which plaintiff sought to enjoin defendant from falsely implying that rum originated in Cuba when it did not, holding that defendant adequately pleaded unclean hands defense by alleging that plaintiffs sold Panamanian rum under "Havana Club" label).

46.  There is no question that SVC's conduct has a "material relation" to the equitable relief that it seeks:  SVC complains about Coca-Cola's claims regarding the presence of calcium and magnesium in Powerade ION4, but it has made virtually identical claims about calcium and magnesium in its own Gatorade Endurance Formula.  Courts in this Circuit and elsewhere have routinely found that a plaintiff's misconduct relates to the subject matter of its claims where, as here, the plaintiff has engaged in the same kind of behavior that it challenges.  See, e.g., Ultreo, Inc., 574 F. Supp. 2d at 354-55; Nikkal Indus., Ltd. v. Salton, Inc., 735 F. Supp. 1227, 1238 (S.D.N.Y. 1990) (explaining that equitable relief would be inappropriate where plaintiff engaged in the "very same conduct" it had challenged); Haagen-Dazs, 493 F. Supp. at 76; see also Morgan Stanley DW, Inc. v. Frisby, 163 F. Supp. 2d 1371, 1380 (N.D. Ga. 2001) (holding that "Morgan Stanley is estopped from seeking a restraining order against competitive conduct which it admits to engaging in"); Salomon Smith Barney Inc. v. Vockel, 137 F. Supp. 2d 599, 603 (E.D. Pa. 2000) (denying plaintiff's motion for a preliminary injunction where it "seeks the help of a court of equity to prevent the same conduct by [the defendant] which it had previously abetted and from which it ha[d] handsomely profited").

47.  SVC cannot, having jumped on the bandwagon of calcium and magnesium first, now jump off and claim that Coca-Cola must get off too.  Therefore, although SVC is not entitled to a preliminary injunction because it has not shown either a likelihood of irreparable injury or a likelihood of success on the merits, its own unclean hands also preclude the equitable relief of a preliminary injunction.

#### CONCLUSION

The foregoing constitutes this Court's Findings of Fact and Conclusions of Law pursuant to Rules 52(a) and 65 of the Federal Rules of Civil Procedure.  For the reasons explained above, the plaintiff's motion for a preliminary injunction is **denied**.

SO ORDERED.

Dated:    New York, New York
          August 4, 2009

                                        John G. Koeltl
                                   United States District Judge

54